## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**REANNA PEYTON**, an Individual, and
**R. PEYTON CONSULTING LLC**, a
Michigan Limited Liability Company,

        Plaintiffs,

v.

**ALL AMERICAN RECYCLING,**
**INC.**, an Illinois Corporation, and
**MICHAEL ZAMBON**, an Individual,

        Defendants.

Case No. 2:23-cv-11885-JJCG-KGA

District Judge Jonathan J.C. Grey

Magistrate Judge Kimberly G. Altman

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, Reanna Peyton and R. Peyton Consulting LLC, by and through their attorneys, The Miller Law Firm, P.C., state as follows for their Second Amended Complaint against Defendants, All American Recycling, Inc., and Michael Zambon:

### PARTIES AND JURISDICTION

1. Plaintiff, Reanna Peyton ("Ms. Peyton"), is a citizen of the State of Michigan who resides in Macomb County, Michigan.

2. Plaintiff, R. Peyton Consulting LLC ("Peyton Consulting"), is a Michigan Limited Liability Company with its principal place of business in Macomb County, Michigan. Ms. Peyton is the sole member of Peyton Consulting.

3. Defendant, All American Recycling, Inc. ("All American"), is an Illinois company with its principal place of business in Chicago, Illinois, which has locations in Aurora, Joliet, and Ford Heights, Illinois.

4. Defendant, Michael Zambon, is a citizen of the State of Illinois who resides in Will County, Illinois. At all relevant times, he was President of All American Recycling, Inc.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of events or omissions that giving rise to Plaintiffs' claims occurred here, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## GENERAL ALLEGATIONS

7. Beginning in 2012, Ms. Peyton, served as Vice President and head broker at Rivore Metals, Inc., a broker and processor of ferrous and non-ferrous metals located in Troy, Michigan.

8. In her position at Rivore Metals, Inc., Ms. Peyton began brokering materials for All American in 2015. All American is an Illinois scrap metal recycling

2

company accepting a wide range of items, such as copper, plate and structural steel, heavy melt steel, busheling, and flame cut steel.

9.      In 2019, Ms. Peyton and Mr. Zambon began discussing a potential partnership. In particular, Mr. Zambon was interested in Ms. Petyon's impressive network of consumer relationships.

10.     On April 11, 2019, Ms. Peyton flew to Chicago and met with Mr. Zambon at a restaurant in order to discuss the potential partnership.

11.     During this meeting, Ms. Peyton agreed to become equal partners with Mr. Zambon (who was acting as an individual and in his capacity as President of All American) in a new brokerage company, All American Resource Management ("AARM"). The parties agreed that all materials sold from All American would move through AARM and the partners were entitled to 50% of the brokerage fees from such sales.

12.     Mr. Zambon, acting on behalf of All American, and Ms. Peyton further agreed that Ms. Peyton was entitled to a sales commission of 50% of brokerage fees from All American, whether or not AARM was operational.

13.     In mid-2019, in reliance on Mr. Zambon's statements, also made on behalf of All American, and the parties' oral partnership and sales commission agreements, Ms. Peyton left Rivore Metals, Inc., and joined All American as an

independent contractor commissioned sales representative while AARM was being created.

14.     Since AARM was not yet up and running, Ms. Peyton and Mr. Zambon, acting as an individual and in his capacity as President of All American, agreed shortly after that her compensation (including sales commissions) would be paid by All American until they obtained financial support to build AARM.   Unless otherwise noted, these agreements were made during the constant and routine communications between Mr. Zambon and Ms. Peyton during the time periods noted.

15.     The parties' sales commission agreement included an agreement that, in addition to sales commissions, Ms. Peyton was entitled to a $250,000 base salary for her brokerage work with All American.

16.     Mr. Zambon instructed Ms. Peyton to create a legal entity which would receive some or all of the commission payments from All American. Accordingly, Ms. Peyton created Plaintiff Peyton Consulting, LLC, which became a party to Ms. Peyton's oral agreement with Mr. Zambon for sales commissions.

17.     Ms. Peyton always lived in Michigan while working for All American, and she and Mr. Zambon agreed that she would continue to work from Michigan with occasional visits to Chicago as needed.

18.     Ms. Peyton and Mr. Zambon typically communicated multiple times daily through various means, including telephone, email, and text.

19.     In August 2019, Ms. Peyton completed the business plan for AARM and provided it to Mr. Zambon. He proposed several company logos to Ms. Peyton, after which he supplied her with business cards identifying her as President of AARM.

20.     AARM received an EIN number and Mr. Zambon established a bank account for AARM, naming himself and Ms. Peyton as the individuals authorized to receive information regarding wire transfers from the account.

21.     In fall 2019, Ms. Peyton began making regular trips to Chicago and Joliet to set up new accounts and began selling to customers, including new customers she procured, generating millions of dollars in revenue.

22.     In October 2019, Mr. Zambon directed Ms. Peyton to conduct an analysis of All American's finances.

23.     Ms. Peyton worked closely with All American's Chief Financial Officer ("CFO") and determined that the company was not recording information correctly or following appropriate accounting practices according to GAAP.

24.     Ms. Peyton brought the issues she had identified to Mr. Zambon's attention.  Shortly thereafter, Mr. Zambon then told Ms. Peyton that he terminated

the CFO of All American and, impressed with Ms. Peyton's financial skills, asked her to assume the position until a permanent replacement could be found.

25.     Ms. Peyton agreed to become *acting interim* CFO of All American in reliance on the acceptance by Mr. Zambon, acting on behalf of All American, of her conditions: that she was entitled to a separate salary and benefits for such work, she could continue to work remotely and was not required to be regularly present in Chicago, and she was primarily charged with continuing her efforts to get the parties' AARM partnership off the ground.  Mr. Zambon agreed to Ms. Peyton's conditions and the parties entered into this third oral agreement.

26.     Due to Ms. Peyton's success as an executive of All American, Mr. Zambon began directing her to assist with executive duties of other companies which he owned and/or controlled.

27.     For example, at Mr. Zambon's request, Ms. Peyton also took on the role of CFO for another of his network of companies, West End Tool & Die, Inc. ("West End"). She also took on the responsibilities for directing human resources at both companies, All American and West End.  In what would become a pattern, Mr. Zambon stated that her work for both companies would be paid by All American.

28.     In the meantime, Ms. Peyton continued to successfully broker for All American, brokering millions of dollars via relationships she procured, including Libertas Copper, TMS International, and I. Shumann & Co.

29.     Based in part on Ms. Peyton's substantially increased workload, in March 2020, Mr. Zambon and Ms. Peyton agreed that the sales they intended to process through AARM would process through All American, as AARM was still not fully set up.

30.     Despite this agreement, All American failed to process her sales commissions.

31.     Mr. Zambon, acting on behalf of All American, and Ms. Peyton further agreed that she would be paid an increased salary from All American, reflecting her expanded responsibilities once the company had navigated the COVID period.

32.     In May 2020, when Ms. Peyton asked Mr. Zambon about payment of her sales commissions, he assured her that he would "square up" the payments due to her after COVID. He asked her to rent a condominium in Chicago at All American's expense to make her regular visits easier to manage. Ms. Peyton did so, and continued to work in reliance on Mr. Zambon's statements.

33.     In June and July 2020, Mr. Zambon asked Ms. Peyton to take on the financial and human resources management of two more of his network of companies, Elite Metals and Sani-Spire. Ms. Peyton agreed to do so in reliance on Mr. Zambon's repeated assurances (in person and via telephone) that she would finally be paid the commissions that were owed to her.

34.     In September 2020, Mr. Zambon agreed that Ms. Peyton should be added to the All American payroll so that she could receive health insurance because AARM was still not fully set up.

35.     Through the end of 2020, Ms. Peyton continued in her role as broker for All American and produced millions of dollars more in revenue. Mr. Zambon also directed her to temporarily become involved in the financial affairs of Solana, his wife's company.

36.     In early 2021, Mr. Zambon directed Ms. Peyton to handle the financial affairs of another of his companies, Chic Properties.

37.     Ms. Peyton did so. When Ms. Peyton pressed Mr. Zambon, again, regarding her unpaid commissions, he offered to lease a new vehicle for her and assured her she would be paid her commissions from All American. Ms. Peyton continued to work in reliance on Mr. Zambon's statements, and her sales activity generated millions more in revenue.

38.     In April 2021, Mr. Zambon represented to Ms. Peyton that he (the President of All American) would finally pay her commissions because he expected a significant return from an investment in a related company, 15 Seconds of Fame, also known as 15 SOF. Ms. Peyton continued to work in reliance on Mr. Zambon's statements.

39.    He also directed Ms. Peyton to take responsibility for the financial affairs and human resources for Solux Development, another of his companies.

40.    In May and June 2021, Ms. Peyton became increasingly busy managing the finances of All American and West End (and Mr. Zambon's other companies) and facilitating Mr. Zambon's purchases of Florida properties via Chic Properties.

41.    Ms. Peyton proposed opening a Michigan office with its own team and hiring a permanent Chief Financial Officer for All American. Mr. Zambon agreed and advised her to locate suitable office space.

42.    Mr. Zambon also began to involve Ms. Peyton in his other personal financial affairs too. For example, in August 2021, he directed her to set up a wire for credits at a Las Vegas hotel to facilitate his gambling. He also asked her to begin tracking his wife's spending, which he believed was out of control.

43.    In September 2021, Ms. Peyton notified Mr. Zambon that one of All American's customers, Midwest Industrial Metals ("Midwest"), had asked to broker through her consulting firm, Plaintiff, Peyton Consulting LLC. Mr. Zambon advised her to do so and to keep her fees from those transactions. Meanwhile, Ms. Peyton leased space for All American's Michigan office and hired a salaried salesperson.

44.    Then, later in 2021, Mr. Zambon directed Ms. Peyton to accompany him to Texas for meeting with Venture Metals, a company interested in purchasing All American. Ms. Peyton did so and advised Mr. Zambon that any sale would have

to be structured to exclude the AARM brokerage business. He concurred, telling Ms. Peyton "it's ours" in a text message referring to their partnership in AARM, and promising that she would be paid her sales commissions when the sale to Venture Metal was completed.

45.     In the fall of 2021, Ms. Peyton focused on building the Michigan office and staff. She continued to broker sales, however, resulting in more millions in revenue for All American. She purchased a new home based on repeated assurances from Mr. Zambon that she would be paid her sales commissions very soon.

46.     In February 2022, Mr. Zambon received a letter from attorneys/accountants for Midwest who were directed to conduct a forensic examination of alleged to be fraudulent acts against Midwest.

47.     Meanwhile, Ms. Peyton's son was hired by All American to handle Mr. Zambon's Crypto Currency portfolio.

48.     In September 2022, Mr. Zambon and Ms. Peyton met to address Ms. Peyton's long overdue sales commissions. By this point, Mr. Zambon understood that Ms. Peyton would leave if there was no action taken on her unpaid commissions.

49.     Mr. Zambon proposed to start paying Ms. Peyton's commissions by paying her, through Peyton Consulting, 50% of her brokered sales net profitability plus 20%, for a total of 70% of the net profit. The additional 20% was agreed upon to compensate for the paydown of the prior brokered sales. Payments were to be

made each time any customer of Ms. Peyton's paid All American for materials received. Mr. Zambon and Ms. Peyton agreed that these partial payments would begin as of January 1, 2023.

50.     While Ms. Peyton was not pleased that the full commission amount owed was not being paid yet, she was encouraged to receive at least a portion of the commission, and she proceeded in reliance on Mr. Zambon's statements.

51.     Mr. Zambon also advised Ms. Peyton to proceed with the purchase of a restaurant in Michigan on the same basis, directing her to take the down payment from All American in expectation of her impending sales commission payments. Ms. Peyton did so, in two portions in late 2022 and early 2023, in reliance on Mr. Zambon's statements and the parties' oral agreement for sales commissions.

52.     Mr. Zambon advised Ms. Peyton to manage the purchase of another company, Alpha Products. She was directed to conduct the onboarding of all of Alpha Products' staff, including its upper management team in early 2023.

53.     In January 2023, Ms. Peyton began taking payments from All American for her partial sales commissions, as previously discussed with Mr. Zambon in September 2022.

54.     In March 2023, Mr. Zambon hired a permanent replacement Chief Financial Officer for All American. He was a man without any experience in the

role. Ms. Peyton agreed to Mr. Zambon's request that she train the new CFO, who confessed to her that he needed to start "at ground zero" in the job.

55.    Unlike her, Ms. Peyton's replacement was tasked with CFO responsibilities for All American only, not for any of Mr. Zambon's other entities. Nevertheless, he was paid close to the salary Ms. Peyton had been receiving for far more work.

56.    In April 2023, Ms. Peyton sent Mr. Zambon an email setting out the sales she had brokered, and the customers she had procured, since she began working with All American in 2019. Total brokered revenue was approximately $261 million, $58.5 million of which was attributable to Ms. Peyton's efforts in procuring new customers.

57.    Also in April 2023, Ms. Peyton's concerns about Mr. Zambon's actions and the financial issues faced by All American prompted her to insist on a written agreement settling all of her monetary claims against Mr. Zambon and the company, including for the AARM partnership and her sales commissions. After an exchange of written messages, the two agreed to meet in person to address the matter.

58.    On May 2, 2023, Ms. Peyton traveled to Joliet, Illinois and met with Mr. Zambon. She provided him with a spreadsheet she had created detailing what she was owed. Mr. Zambon agreed that they would reach a settlement regarding those amounts, but he wanted her to continue in her broker role only and on the All

American payroll for at least two years, which included historical benefits of a 401(k) plan, health insurance, dental insurance, and life insurance.

59.    Ms. Peyton agreed in reliance on Mr. Zambon's acceptance of the conditions that she retain access to the Chicago condominium and use of her vehicle leased by All American until the lease was concluded, and that her son would also be kept on the All American payroll. Mr. Zambon agreed to all of the conditions.

60.    Ms. Peyton followed up with email and text confirmations of her agreement with Mr. Zambon. Mr. Zambon did not object to her characterization of their agreement.

61.    Ms. Peyton requested that she and Mr. Zambon execute a formal, written document embodying the terms they had agreed upon. She suggested that Mr. Zambon have a first draft prepared by an attorney. Counsel retained by Mr. Zambon contacted Ms. Peyton, requesting the total amount owed to her and supporting documentation. Ms. Peyton, through her counsel, provided that information on June 2, 2023.

62.    Later in June 2023, Mr. Zambon's counsel abruptly demanded that Ms. Peyton turn over the keys to the leased vehicle and remove her belongings from the Chicago condominium. Mr. Zambon also terminated Ms. Peyton's compensation and benefits without notice and terminated her son's employment.

63.     All of Mr. Zambon's actions were in direct violation of Mr. Zambon's agreements, including those made on behalf of All American, and his most recent agreement from only weeks before.

64.     Throughout her business relationship with Mr. Zambon, Ms. Peyton was the only woman in a management role at any of his companies. Ms. Peyton was routinely excluded from company meetings, events, other functions, and text groups that were open to male management only. She was included in only a single event during her entire business relationship with All American and Mr. Zambon's other entities.

65.     Ms. Peyton filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") under  Title VII of the Civil Rights Act of 1964, as amended.  She obtained a Right to Sue letter from the EEOC.

**COUNT I**
**BREACH OF CONTRACT:**
**FAILURE TO PAY SALES COMMISSIONS**
**(AGAINST ALL AMERICAN)**

66.     Plaintiffs reallege the preceding Paragraphs as if fully set forth.

67.     All American, through its President Mr. Zambon, agreed to pay Ms. Peyton sales commissions, either directly to Ms. Peyton or to her company Peyton Consulting, based on sales of all brokered material. (*See* Paragraphs 12-13, 16, *supra.*)

14

68.     Mr. Zambon repeatedly confirmed the oral agreement to Ms. Peyton on a number of occasions, assuring her that she and/or Peyton Consulting would be paid in full for all sales commissions, including in May, June, and July 2020, early 2021, April 2021, later in 2021, September 2022, and May 2, 2023. (*See* Paragraphs 32-33, 37-38, 44, 48-50, 57-60, *supra.*)

69.     In September 2022, Mr. Zambon and Ms. Peyton met and Mr. Zambon presented a plan to start to pay her for sales commissions owed to her.

70.     Although All American began making partial payments on the commissions, All American failed to pay the vast majority of Ms. Peyton's sales commissions.

71.     All American breached the parties' agreement by failing to pay the full amount of Ms. Peyton's sales commissions.

72.     As a direct and proximate result of All American's breach of contract, Plaintiffs have been damaged, continue to suffer damages, and are entitled to monetary damages in the form of actual damages, compensatory damages, exemplary/punitive damages, and court costs.

**COUNT II
VIOLATION OF THE MICHIGAN SALES
REPRESENTATIVE COMMISSION ACT
(AGAINST ALL AMERICAN)**

73.     Plaintiffs reallege the preceding Paragraphs as if fully set forth.

74.     All American is a "principal" and Ms. Peyton is a "sales representative" pursuant to the terms of the Michigan Sales Representative Commission Act, MCL §§ 600.2961(1)(d) and (1)(e) ("MSRCA").

75.     All American, through its President Mr. Zambon, agreed to pay Ms. Peyton "commissions," either directly to her or through her company, Peyton Consulting, as defined in the MSRCA, MCL §§ 600.2961(1)(a). (*See* Paragraphs 12-13, 16, *supra.*)

76.     All American, through its President Mr. Zambon, entered into an oral agreement whereby All American would pay Ms. Peyton (either directly to her or to her company, Peyton Consulting) sales commissions based on all brokered sales. *Id.*

77.     Mr. Zambon repeatedly confirmed the oral agreement to Ms. Peyton on a number of occasions, assuring her that she would be paid in full for all sales commissions, including in May, June, and July 2020, early 2021, April 2021, later in 2021, September 2022, and May 2, 2023. (*See* Paragraphs 32-33, 37-38, 44-45, 48-51, 57-60, *supra.*)

78.     All American intentionally failed to pay Ms. Peyton's sales commissions when due despite Ms. Peyton's repeated requests for payment.

79.     All American's intentional failure to pay sales commissions constitutes a violation of the MSRCA.

80.     As a direct and proximate result of All American's violation of the MSRCA, Plaintiffs have been damaged, continue to suffer damages, and are entitled to monetary damages in the form of actual damages, compensatory damages, a damages multiplier, and their reasonable attorneys' fees and court costs.

### COUNT III
### BREACH OF CONTRACT:
### FAILURE TO PAY WAGES AND BENEFITS
### (MS. PEYTON AGAINST ALL AMERICAN)

81.     Plaintiff Ms. Peyton realleges the preceding Paragraphs as if fully set forth.

82.     Ms. Peyton and All American, through its President Mr. Zambon, entered into an oral agreement that Ms. Peyton would be paid wages and benefits for serving a Chief Financial Officer and performing human resources functions for All American. (*See* Paragraphs 24-25, *supra.*)

83.     The parties subsequently agreed that Ms. Peyton would be paid additional wages and benefits, from All American, for serving as Chief Financial Officer and performing human resources functions for several other entities controlled by Mr. Zambon. (*See* Paragraphs 26-27, 31 *supra.*)

84.     Defendant breached its agreement by failing to pay Ms. Peyton the agreed upon wages and benefits for her services.

85.     As a direct and proximate result of Defendant's breach of contract, Plaintiff has been damaged, continues to suffer damages, and is entitled to monetary

damages in the form of actual damages, compensatory damages, exemplary/punitive damages, and court costs.

**COUNT IV**
**BREACH OF CONTRACT:**
**EQUITABLE OWNERSHIP**
**(MS. PEYTON AGAINST ALL DEFENDANTS)**

86.    Plaintiff Ms. Peyton realleges the preceding Paragraphs as if fully set forth.

87.    Ms. Peyton and Michael Zambon, acting in his personal capacity and as the President of All American, entered into an oral agreement that Ms. Peyton would receive 50% equity ownership in AARM, which was to serve as the brokerage arm of All American. (*See* Paragraph 11, *supra*)

88.    Mr. Zambon confirmed the oral agreement to Ms. Peyton, assuring her that she would receive equity ownership in AARM. (*See* Paragraphs 25, 44, *supra.*)

89.    Defendants breached the parties' agreement by failing to provide Ms. Peyton with equity ownership in AARM.

90.    As a direct and proximate result of Defendants' breach of contract, Plaintiff has been damaged, continues to suffer damages, and is entitled to monetary damages in the form of actual damages, compensatory damages, exemplary/punitive damages, and court costs.

## COUNT V
## FRAUD

91.     Plaintiffs reallege the preceding Paragraphs as if fully set forth.

92.     As alleged above, Mr. Zambon, acting in his capacity as President of All American, made materially false representations to Plaintiffs, including that All American's then-existing business and her performance at Rivore Metals, Inc. meant that it made financial sense for her to join All American, and that Ms. Peyton and/or Peyton Consulting was/were entitled to sales commissions on the business she brokered. (*See* Paragraphs 11, 12, 14, 32, 33, 37, 38, 41, 44, 45, 49, 51, 58, 60, *supra.*)

93.     Mr. Zambon, on behalf of All American, further represented that Ms. Peyton was entitled to additional wages and benefits for work performed for All American and other various companies controlled and/or owned by Mr. Zambon. (*See* Paragraphs 24-27, 31, *supra.*)

94.     Defendants knew the statements were false when the statements were made.

95.     Defendants made the statements with the intent to defraud.

96.     Plaintiffs reasonably relied on the statements. (*See* Paragraphs 13, 25, 32-33, 37-38, 45, 50-51, 59, *supra.*)

97.     As a direct and proximate result of Defendants' fraud, Plaintiffs have been damaged, continue to suffer damages, and are entitled to monetary damages in

the form of actual damages, compensatory damages, exemplary/punitive damages, and court costs.

## COUNT VI
## FRAUD
## (MS. PEYTON AGAINST ALL DEFENDANTS)

98.    Plaintiff realleges the preceding Paragraphs as if fully set forth.

99.    Mr. Zambon, acting as an individual and in his capacity as President of All American, made materially false representations to Plaintiff, including that he and Ms. Peyton were equal partners in AARM. (*See* Paragraphs 11, 25, *supra.*)

100.    Defendants knew the statements were false when the statements were made.

101.    Defendants made the statements with the intent to defraud Plaintiffs.

102.    Plaintiff reasonably relied on the statements. (*See* Paragraphs 13, 25 *supra*)

103.    As a direct and proximate result of Defendants' fraud, Plaintiff has been damaged, continue to suffer damages, and are entitled to monetary damages in the form of actual damages, compensatory damages, exemplary/punitive damages, and court costs.

## COUNT VII
## PROMISSORY ESTOPPEL
## (AGAINST ALL AMERICAN)

104.    Plaintiffs reallege the preceding Paragraphs as if fully set forth.

20

105.   Mr. Zambon, acting in his capacity as President of All American, made promises to Ms. Peyton (who is also the President of Peyton Consulting), including that Ms. Peyton and/or Peyton Consulting was entitled to sales commissions for business she brokered.

106.   Mr. Zambon, acting in his capacity as President of All American, should have reasonably expected that the promises would induce action of a definite and substantial character by Plaintiffs.

107.   Plaintiffs did indeed rely on the promises of Mr. Zambon, acting in his capacity as President of All American. (Paragraphs 13, 25, 32-33, 37-38, 45, 50-51, 59, *supra.*)

108.   The promises must be enforced to avoid injustice.

109.   As a direct and proximate result of the conduct of Mr. Zambon, acting in his capacity as President of All American, Plaintiffs have been damaged, continue to suffer damages, and are entitled to monetary damages in the form of actual damages, compensatory damages, exemplary/punitive damages, and court costs.

## COUNT VIII
## PROMISSORY ESTOPPEL
## (MS. PEYTON AGAINST ALL DEFENDANTS)

110.   Plaintiff realleges the preceding Paragraphs as if fully set forth.

111.   Mr. Zambon, acting as an individual and in his capacity as President of All American, made promises to Ms. Peyton, including that Ms. Peyton was an equal

partner in AARM and that she was entitled to wages and benefits for work performed as acting Chief Financial Officer of All American and other various companies controlled and/or owned by Mr. Zambon. (Paragraphs 11-14, 16, 24-27, 31-33, 37-38, 44-45, 48--51, 57-60, *supra*)

112.   Defendants should have reasonably expected that the promises would induce action(s) of a definite and substantial character by Ms. Peyton.

113.   Ms. Peyton did indeed rely on Defendants' promises. (Paragraphs 13, 25, *supra.*)

114.   The promises must be enforced to avoid injustice.

115.   As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged, continues to suffer damages, and is entitled to monetary damages in the form of actual damages, compensatory damages, exemplary/punitive damages, and court costs.

## COUNT IX
## UNJUST ENRICHMENT

116.   Plaintiffs reallege the preceding Paragraphs as if fully set forth.

117.   As set forth above, Defendants, All American and Mr. Zambon, benefited from Plaintiffs' conduct as a commissioned sales representative and acting Chief Financial Officer of All American and several other of Mr. Zambon's corporate entities.

118. It would be inequitable for Defendants to retain these benefits, including benefits in the form of sales commissions, ownership equity, compensation, and/or other benefits.

119. As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged, continue to suffer damages, and are entitled to monetary damages in the form of actual damages, compensatory damages, exemplary/punitive damages, and court costs.

## COUNT X
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## (MS. PEYTON AGAINST ALL DEFENDANTS)

120. Ms. Peyton realleges the preceding Paragraphs as if fully set forth.

121. At all times relevant to this action, Ms. Peyton, as a female, belonged to a protected class under the Michigan Elliott-Larsen Civil Rights Act.

122. At all times relevant to this action, Defendants were Plaintiff's "employer" within the meaning of the Michigan Elliott-Larsen Civil Rights Act.

123. Ms. Peyton was qualified for her position as CFO of All American and West End. Ms. Peyton was also qualified for the human resources work she performed for All American, and for Mr. Zambon's other entities including, but not necessarily limited to, West End and Sani Spire.

124.   Ms. Peyton generally worked 15 to 18 hours per day, seven days per week, in order to accomplish all the work she performed for All American and Mr. Zambon's other entities.

125.   Ms. Peyton, even though she was based in Michigan, spent considerable time in Chicago and Joliet, Illinois working for Defendants. Because of the amount of time spent in Chicago, Mr. Zambon directed Ms. Peyton to find a condo in the city for her to use during her stays.

126.   Throughout her business relationship with Mr. Zambon, Ms. Peyton was the only woman in a management role at any of his companies.

127.   Throughout her business relationship with Mr. Zambon, Ms. Peyton was subject to a sexual hostile working environment, which included at least the following:

A.   Ms. Peyton was constantly getting messages from Mr. Zambon calling employees "cunts" and "pussies".

B.   Ms. Peyton was repeatedly told by Mr. Zambon that "I was a pussy" or "stop being a pussy". On at least one occasion, Mr. Zambon told her "no, eat a cock".

C.   The fact that Ms. Peyton was a single woman with children was frequently a topic of conversation at work.

24

D.   When Ms. Peyton complained to Mr. Zambon about "cat calls" in the distance during a walk through the plant floor, he told her to "shut the fuck up, you are starting to sound like Danielle", who was a female employee who complained about sexual harassment at West End.

E.   At one point, a picture of penis was drawn in the snow on her vehicle, and when Ms. Peyton asked Mr. Zambon if this was done by the Ops Manager, the question went unanswered.

F.   On May 21, 2021, Mr. Zambon told Ms. Peyton to tell the "nasty bitches", referring to Ms. Peyton and the other two female employees at West End, not to put their bloody tampons in the trash can in the women's bathroom.

G.   Defendants each year provided a calendar of "nude" women to clients and male employees for Christmas. Ms. Peyton advised Mr. Zambon not to use this calendar due to the potential for legal trouble. Mr. Zambon never responded to Ms. Peyton's text message regarding this calendar.

H.   Ms. Peyton was frequently sent pictures of penises by the Operations Manager.

I.   Ms. Peyton was sent photos of naked black men.

25

J.    On numerous occasions, magnetic penis toys were left on the outside of Ms. Peyton's vehicle.

K.    Ms. Peyton was "teased" about "taking one for the team" with difficult male clients.

L.    Mr. Zambon and all of the males in management referred to an individual named Christopher Housefield as Ms. Peyton's boyfriend.

M.    In September of 2022, Mr. Zambon explained to Ms. Peyton that he could no longer be in business with her or buy into any business with her because she was a woman.

128.   Ms. Peyton was treated differently than similarly situated men who worked for Defendants and Mr. Zambon's other entities.

129.   Ms. Peyton repeatedly received less money for the work that she performed than male employees, who performed less work and had less qualifications, experience, and responsibilities than her.

130.   In March of 2022, Ms. Peyton discovered that a male employee, who she was tasked with terminating, had been making significantly more money than Ms. Peyton, even though this employee was beneath Ms. Peyton in terms of title and responsibilities.

131.   The new male CFO that Ms. Peyton was required to train was paid close to the same salary as Ms. Peyton, even though he was less experienced and only

performed work for All American (unlike Ms. Peyton) and, as a result, worked significantly fewer hours than Ms. Peyton.

132.   Ms. Peyton was excluded from events that male employees were invited to attend, such as lunch and dinner meetings, fishing trips, snowmobile trips, Christmas parties, a wine tour trip, and a Fourth of July party. While many of these events were in Illinois, they also occurred in Las Vegas, Nevada, Florida, and California. A male manager attended a conference of the Association of Women in the Metal Industries, even though Ms. Peyton was the only woman in management at All American.

133.   There were many text messages among the male management employees that Ms. Peyton was excluded from participating in. Ms. Peyton knew of these text messages because when she would question why something was or was not being done a certain way, the answer was "it's in the text with the boys". This created an uncomfortable working situation for Ms. Peyton as she was expected to run the company but at the same time was excluded from the management group's text messages.

134.   Mr. Zambon promised Ms. Peyton the opportunity to enter into property deals with him, including an investment in Frankfort, Illinois. Although this was an investment opportunity, Mr. Zambon explained that this would be a way for Ms. Peyton to be paid some of what was owed to her.  Later, Mr. Zambon told Ms.

Peyton that he could not enter into any more partnerships with anyone, so the Frankfort property went through with him as the 100% owner. However, Ms. Peyton later learned that Mr. Zambon bought a property with a new male employee, Kristofer Ames, which was similar to the promised Frankfort, Illinois deal. In reality, Mr. Zambon simple refused to do any business deals with Ms. Peyton, because she was a woman.

135. Ms. Peyton was subjected to adverse employment actions by Defendants on account of her sex in the following, among other, ways:

A.     As discussed above, Ms. Peyton was exposed to sexually hostile working conditions.

B.     Ms. Peyton did not receive promised sales commissions, notwithstanding her substantial contribution to the revenue of All American, including but not limited to her success in procuring new customers;

C.     Ms. Peyton received lower compensation in her role as CFO of All American and Mr. Zambon's other entities and for carrying out human resources responsibilities for those entities.

D.     Ms. Peyton did not receive promised equity ownership in any of Mr. Zambon's entities despite such ownership being provided to other, less successful and less qualified men;

E.     Ms. Peyton was replaced as CFO of All American by a man who was less qualified and performed fewer duties than Ms. Peyton, but who earned substantially the same compensation for providing services only to All American, while Ms. Peyton was required to work more hours and provide more services to other companies owned by Mr. Zambon; and

F.     Ms. Peyton was routinely excluded from company meetings, events, other functions, and group texts that were open to male management only. She was included in only a single event during her entire business relationship with All American and Mr. Zambon's other entities.

136.   Defendants intentionally and purposefully discriminated against Ms. Peyton on account of her sex.

137.   Unlawful discrimination against Ms. Peyton based on her sex was a motivating factor in Defendants' unfair and unequal treatment of Ms. Peyton.

138.   Defendants acted with a reckless or callous disregard of, or indifference to, the rights of Ms. Peyton based on her sex.

139.   Ms. Peyton was subjected to adverse employment actions when Defendants deliberately excluded her from activities, events, and communications, which negatively affected Ms. Peyton's ability to perform her duties as management, when Defendants refused to pay her agreed-upon compensation and sales

commissions, when Defendants paid her less, even though she was more qualified, had to performed more hours and had a greater scope of work than men had to undertake for substantially similar wages, and when Defendants refused to provide her with equity ownership in one or more of Mr. Zambon's entities as agreed.

140.   Ms. Peyton was treated differently than similarly situated men who worked for All American and one or more of Mr. Zambon's other entities.

141.   Defendants would not have taken these actions against Ms. Peyton if not for her sex.

142.   As a direct and proximate result of the unlawful discrimination against her, Plaintiff has been damaged, continues to suffer damages, including but not limited to, loss of pay, loss of benefits, emotional anguish, humiliation, embarrassment, and pain and suffering, and Plaintiff is entitled to monetary damages in the form of actual damages, compensatory damages, exemplary and/or punitive damages, pre-judgment interest and her reasonable attorneys' fees, and court costs.

## COUNT XI:
## SEX OR GENDER DISCRIMINATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT, AS AMENDED
## (MS. PEYTON AGAINST ALL AMERICAN)

143.   Ms. Peyton realleges the preceding Paragraphs as if fully set forth.

144.   Ms. Peyton is a member of a protected class, in that she is a female, and she was the only female in management at All American.

30

145.   At all times relevant to these allegations, All American, was an "employer" as defined by Title VII of the Civil Rights Act of 1964 (42 U.S.C.A. § 2000e(b)), and All American is accordingly covered by, and subject to, Title VII.

146.   As more fully set forth above, Ms. Peyton was subjected to adverse employment actions when All American deliberately excluded her from activities, events, and communications, which negatively affected Ms. Peyton's ability to perform her duties with management, when All American refused to pay her agreed-upon compensation and sales commissions, when All American paid her less, even though she was more qualified then and had to performed more hours and had a greater scope of work than men had to undertake for similar wages, and when All American created a sexually hostile work environment for Ms. Peyton.

147.   All American treated similarly situated employees outside of Plaintiff's protected class more favorably than Ms. Peyton was treated, as more fully set forth above.

148.   Ms. Peyton was qualified to perform her job duties as more fully set forth above.

149.   All American engaged in disparate treatment discrimination against Ms. Peyton, as more fully set forth above, and engaged in intentional discrimination against Ms. Peyton in the terms and conditions of Ms. Peyton's employment as more fully set forth above.

150.   All American's conduct was motivated by her sex and constitutes unlawful discrimination on the basis of sex or gender against Ms. Peyton, in violation of Title VII of the Civil Rights Act of 1964, as amended.

151.   Ms. Peyton has satisfied the prerequisites to suit imposed by Title VII, in particular, Ms. Peyton filed a timely charge with the Equal Employment Opportunity Commission (EEOC) and Ms. Peyton received from the EEOC a "Notice of Right to Sue."

152.   As a direct and proximate result of All American's discrimination, Plaintiff has been damaged, continues to suffer damages, including but not limited to, loss of pay, loss of benefits, emotional anguish, humiliation, embarrassment, and pain and suffering, and Plaintiff is entitled to monetary damages in the form of actual damages, compensatory damages, exemplary and/or punitive damages, pre-judgment interest and her reasonable attorneys' fees, and court costs.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully requests the following relief:

A.   A judgment that Defendants are liable to Plaintiffs for breach of contract, as set forth above;

B.   A judgment that Defendant, All American, is liable to Plaintiffs for violating the Michigan Sales Representative Commission Act, MCL §§ 600.2961, *et seq.*

C.      A judgment that Defendants are liable to Plaintiffs for fraud, as set forth above.

D.      A judgment that Defendants are liable to Plaintiffs for promissory estoppel, as set forth above.

E.      A judgment that Defendants are liable to Plaintiffs for unjust enrichment, as set forth above.

F.      A judgment that Defendants are liable to Plaintiff, Reanna Peyton, for violating Michigan's Elliott-Larsen Civil Rights Act, MCL § 37.2101, *et seq*.;

G.      A judgment that Defendant, All American, is liable to Plaintiff, Peyton, for violation Title VII of the Civil Rights Act, as amended.

H.      An award of damages as a result of the foregoing, including but not limited to actual damages, compensatory damages, exemplary and/or punitive damages, loss of pay, loss of benefits, emotional anguish, humiliation, embarrassment, and pain and suffering, prejudgment interest and Plaintiffs' costs of litigation, and reasonable attorneys' fees as provided by the applicable statutes; and

I.      An award to Plaintiffs of such other and further relief to which they may be entitled and which the Court finds to be just and appropriate.

### JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

By:  /s/ *Kevin F. O'Shea*
Kevin F. O'Shea (P40586)
Ann L. Miller (P43578)
950 W. University Dr., Suite 300
Rochester, Michigan 48307
(248) 841-2200
kfo@millerlawpc.com
alm@millerlawpc.com

*Attorneys for Plaintiffs*

Dated: July 2, 2024

## CERTIFICATE OF SERVICE

I certify that on the foregoing document was served on all parties or their counsel of record through the Court's CM/ECF system, which will send notification of this filing to all registered users or, if they are not registered users, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

 /s/ *Kevin F. O'Shea*